STATE RESERVE LIFE INSURANCE COMPANY, Appellant,

v.

Minnie IVES, Appellee.

No. 17700.

Court of Civil Appeals of Texas, Fort Worth.

March 19, 1976.

Rehearing Denied April 16, 1976.

Joe James Sawyer, Fort Worth, for appellant.

Dixon & Petrovich, and Ralph H. Walton, Jr., Granbury, for appellee.

·OPINION

SPURLOCK, Justice.

This is an appeal from a judgment rendered against State Reserve Life Insurance Company wherein Minnie Ives, the surviving widow of W. N. Ives, as beneficiary, brought suit to recover on a credit life insurance policy written on the life of her husband. The insurance company appealed from an adverse jury verdict on the grounds that W. N. Ives had misrepresented the condition of his health in his application for insurance.

We affirm.

The only contested issue in this case is whether the deceased was in good health and free from physical impairment or any chronic disease when he applied for insurance.

We will analyze in a brief and general way the evidence on both sides on the issue of "good health". This becomes necessary since, essentially, the basis of this appeal is the defendant's contention that the jury's answer to this issue is not supported by the evidence.

Minnie Letha Ives testified that she is the surviving widow of the deceased; they had been married to each other for 43 years;

they desired to purchase two lots near Lake Granbury to be used by them for recreational purposes. They purchased these lots from Indian Harbor, Inc. and signed a sales contract providing for the payment of $35.40 per month for 60 months, being the purchase price of the lots. The salesman for the development company offered credit life insurance to W. N. Ives.

The application for insurance signed by Ives was designed in such a manner that the applicant could apply for life, accident and health, and total disability benefits, or a combination of these. Ives applied for life insurance only. The application did not require the furnishing of information concerning the applicant's past medical history. Concerning the insured's health the application contained only the following clause:

"INSURABILITY: I hereby represent that I am now in good health, both mentally and physically, and free from any mental or physical impairment or any chronic disease. I understand that the policy does not cover disability caused by any disease or injury originating while I was not insured under the Group Policy, except seven day retroactive disability benefits which are payable without regard to date of origin." This last sentence is not applicable because the deceased did not apply for disability benefits.

The master policy provides that the creditor was the principal beneficiary to the extent its interest may appear and the plaintiff was the contingent beneficiary, she to receive the benefits of the policy remaining after the creditor had been paid.

The creditor, Indian Harbor, paid a single premium to the defendant for the insurance for the five full years of its term. The amount of premium was added to the debt and was incorporated in the note that the deceased signed. At time of trial Indian Harbor made no claim to the proceeds of the insurance policy. At time of deceased's death the amount of the debt owed was $1,911.55, which is the amount of the judgment, plus penalty and attorney's fees.

Plaintiff testified that her husband was superintendent of the Brazos Electric Power Cooperative for the Northern District. He had been so employed for the past 30 years and was so employed at the time of his death. He had always been healthy and active. He died October 13, 1972, some seven and a half months after the insurance policy had been issued. In 1964 while on company business and driving in from Waco he had a supposed heart attack but continued driving home to Granbury, Texas. She could not tell there was anything wrong with him. From that time until his death he was never hospitalized and never stayed in bed nor missed working on account of illness. He was a very active man. Besides doing the work for his employer he worked in his yard and garden. In the entire 43 years they had been married he had been in the hospital only one time. On this occasion in 1964 when he arrived home from Waco he complained he was hungry and did not feel good. He had never complained of chest pains or stomach pains. After that episode in 1964 he saw Dr. John G. Little about once each three weeks who prescribed medication. Dr. Little at one time referred him to Dr. Goggans, a cardiologist. She accompanied her husband to the doctor's office and the doctor, ". . . told us to go on back. Acted like he didn't have a heart attack." Dr. Little had never told her that her husband had had a heart attack.

On the day of her husband's death he had worked all day on the job. On October 13, 1972, at about 2:00 A.M., while Mr. Ives was in bed he began groaning and awakened the plaintiff. She called the doctor and before the doctor arrived her husband died. There was no autopsy.

Edward Dean Matlock testified that he is Superintendent of the Brazos Electric Power, had known Mr. Ives for 27 or 28 years and had worked directly or indirectly under him, the deceased had never missed any time from work, Mr. Ives appeared to be in good health on the day of his death, and he appeared to be in good health over this period of years.

Dr. John G. Little testified that he was a general practitioner and was now retired.

He first saw Mr. Ives in his office on June 10, 1964, at which time the patient complained of dizziness and a tenderness under his sternum (a bone in the center of his chest). He ran an EKG and reached the conclusion that the nerves in his heart which caused the blood to go through a certain artery were being interfered with, and the patient had had a mild heart attack. The precise diagnosis was chronic myocarditis. He explained that this means an "inflammation of the muscle" of the heart. "Myo" means muscle and "carditis" refers to the inflammation of that muscle. He told the patient to stay off work for six weeks and he could then resume light work. His treatment consisted of thinning the blood so it would circulate more freely through the arteries. He did not advise Mrs. Ives of her husband's condition. He had told the deceased that he was not in good health. He did not testify whether he made this statement to the deceased before or after the application for insurance was made. He had prescribed nitroglycerin tablets for pain to be taken when needed. On the day of Mr. Ives' death the doctor was contacted by telephone at 2:00 A.M., went to the deceased's home and found that Ives had died before he arrived. He testified that based upon his records it was his opinion that the cause of death was coronary occlusion.

At the request of the insurance company, on September 4, 1974, this doctor wrote a letter concerning the deceased which outlined the course of his treatment and his diagnosis. He saw the patient at frequent intervals over this period of eight years and over this period of time the deceased had only two spells of pain severe enough for the patient to seek consultation, which was in 1968 and 1969. In that letter he stated: "Mr. Ives was an energetic, robust, uncomplaining man who enjoyed intervals of time where he felt so well that my office would have to call him to remind him of appointments."

At the request of the defendant the court submitted to the jury defendant's requested Issue No. 1. The issue, the jury's answer thereto, and the court's definition of "good health" is as follows:

## "SPECIAL ISSUE NO. 1

"Do you find from a preponderance of the evidence that at the time he applied for the credit life policy in question, W. N. Ives was not in 'good health' as the term 'good health' has been defined for you?

"Answer: 'He was in good health' or 'He was not in good health'.

"ANSWER: He was in good health.

"In connection with the above Special Issue you are instructed that GOOD HEALTH does *not mean perfect health*, but means state of health free from any disease or bodily infirmity of *substantial nature* which affects general soundness and healthfulness of system seriously or materially increases risk to be assumed by the insurance company." (Emphasis ours.)

The defendant did not object to this definition.

Issues 2 through 5 made inquiry of the jury whether or not Ives, at the time he applied for the credit life policy in question, (2) knew that he was not in good health, (3) misrepresented the state of his health, (4) knew or should have known that the defendant would rely upon his misrepresentation of his health, and (5) that defendant relied upon the misrepresentation. These issues were conditioned upon the jury's finding that Ives was not in good health and therefore under the Court's instruction the jury did not answer these issues.

The defendant assigns 9 points of error.

■ By its following points defendant claims the court erred in the following respects: (Point 2) in not granting an instructed verdict; (Point 3) in not granting its motion for judgment non obstante veredicto; (Point 6) in not disregarding the jury's finding to Special Issue No. 1 because the answer was against the great weight; (Point 7) in not granting its motion for judgment non obstante veredicto because there was no evidence to support the find-

ings of the jury on Issue No. 1; (Point 8) in not granting judgment non obstante veredicto because the evidence was insufficient.

The record does not contain any such motions. In the absence of such motions the court cannot consider these points of error. These points are overruled.

■ The defendant, by its point of error No. 9, asserts the trial court erred in not granting the defendant's motion for new trial. This point is overruled. It is too general to be considered. Rule 418, T.R. C.P.; *Schad v. Williams,* 398 S.W.2d 603 (Tex.Civ.App., Dallas, 1965, ref., n. r. e.).

■ The defendant, by its points of error Nos. 4 and 5, asserts the court erred in submitting Special Issue No. 1 because there was no evidence and because the evidence was wholly insufficient. The defendant requested these issues and received the precise issue requested. These points are overruled.

The defendant by its point of error No. 1 asserts the trial court erred in not holding as a matter of law that W. N. Ives was not in good health at the time in question.

The defendant in its statement, argument, and prayer indicates that its real complaint is that the jury's answer to Special Issue No. 1 is not supported by any evidence and therefore the judgment should be reversed and rendered; and in the alternative that the jury's answer thereto is not supported by sufficient evidence and the jury's answer is against the great weight and preponderance of the evidence and therefore the cause should be remanded.

■ In 38 Texas Law Review, p. 361 (1960), there appears an article by Robert W. Calvert, a former Chief Justice of the Supreme Court of Texas, entitled, " 'No Evidence' and 'Insufficient Evidence' Points of Error". At page 362 in the section entitled, "No Evidence Points—Procedural Basis for Points", Chief Justice Calvert states:

" 'No evidence' points of error are inherently and fundamentally points which call for reversal of a trial court's judgment and rendition of judgment for the appellant.

They must therefore, be based upon and related to *one or more* of the following procedural steps in the trial court: (a) motion for instructed verdict; (b) objection to the submission to the jury of a vital fact issue; (c) motion for judgment notwithstanding the jury's verdict; (d) motion to disregard the jury's answer to a vital fact issue. All are steps which must be taken before the rendition of judgment. (Citing authorities.)" (Emphasis ours.) See also: *In Re King's Estate,* 150 Tex. 662, 244 S.W.2d 660 (1951); "The Question of Insufficient Evidence On Appeal", by W. St. John Garwood, a former Associate Justice of the Supreme Court of Texas, 30 Texas Law Review 803 (1952); and "Appealing Jury Findings", 12 Houston Law Review, p. 65 (1974).

None of these procedural steps were followed by defendant in the case before us. In addition thereto this Court finds that there is evidence in the record of probative force upon which the jury based its answer to Special Issue No. 1.

This point is overruled.

We will next pass upon defendant's contention that the evidence is insufficient to support the jury's finding that the deceased was in good health and that the jury's finding is so contrary to the great weight and preponderance of the evidence as to be clearly wrong.

In compliance with the law the policy of insurance provided that the statements made by the applicant for insurance shall be deemed representations and not warranties.

■ In order to establish its defense factually in this case the defendant was required to have obtained a favorable jury answer to each of the following elements of its defense: (1) that the statements made by the applicant were false; (2) that the applicant knew the statements to be false; (3) that the false statements by the applicant were made willfully and with the intention of inducing the insurer to issue the policy; (4) the statements must have been material; (5) the statements must have

been relied on by the insurer. *Industrial Life Ins. Co. v. First Nat. Bank of Perryton*, 449 S.W.2d 129 (Tex.Civ.App., Tyler, 1969, no writ hist.); *Pioneer American Insurance Company v. Meeker*, 300 S.W.2d 212 (Tex. Civ.App., Fort Worth, 1957, ref., n. r. e.), and *Clark v. National Life & Accident Ins. Co.*, 145 Tex. 575, 200 S.W.2d 820 (1947).

The defendant has the burden of proof on each of these issues, *Empire Life and Hospital Insurance Co. v. Shannon*, 415 S.W.2d 532 (Tex.Civ.App., Amarillo, 1967, no writ hist.).

■ Opinion testimony does not establish any material fact as a matter of law. *Hood v. Texas Indemnity Ins. Co.*, 146 Tex. 522, 209 S.W.2d 345 (1948); *Texas Life Ins. Co. v. Hatch*, 167 S.W.2d 802 (Tex.Civ.App., Eastland, 1942, writ ref., w. o. m.). The opinion of the doctor in this case is but evidentiary and is not binding on the trier of the facts.

■ The jury may also take into consideration the medical witness' skill and experience and his manner and attitude in testifying. *Houston General Insurance Company v. Pegues*, 514 S.W.2d 492 (Tex.Civ.App., Texarkana, 1974, ref., n. r. e.).

The case of *Great American Reserve Insurance Co. v. Britton*, 406 S.W.2d 901 (Tex. Sup., 1966) is quite similar factually to the case before us. That also was a case in which the jury found that the deceased was in good health. There was medical testimony to the effect that the deceased was suffering coronary sclerosis and coronary insufficiency. A doctor testified that two years before the policy was delivered he had examined the deceased. This examination consisted of X-rays and an electrocardiogram. His opinion at that time was that the insured had heart trouble which he diagnosed as angina pectoris. Two other doctors testified that the insured had heart trouble. The beneficiary obtained a judgment for the proceeds of a non-medical policy issued on the life of the deceased. This judgment was affirmed.

The Supreme Court stated: "It would avail Great American nothing to set aside the jury's answer to the issue: it still would not have discharged its burden of obtaining a finding from a preponderance of the evidence that Britton *was not* in good health, a finding essential to its right to cancel and to its defense to the cross-action if the issue is one of fact. See 38 T.L.R. 359, 363 (1960)."

That court then defines "good health", ". . .' as a state of health free from any disease or bodily infirmity of a *substantial* nature which affects the general soundness and healthfulness of the system *seriously* or *materially* increases the risk to be assumed by the insurer. . . . We have also held that a good health provision is breached if the applicant 'is suffering from a *serious* kind of illness, *which continues and eventually causes his death.*'"

In regards to the question of heart trouble, angina pectoris, coronary insufficiency and good health, and how much such conditions may have seriously affected the soundness of Britton's health are normally fact questions. In this connection the court stated: "These are relative matters, and except in extreme cases should be left for jury determination from evidence introduced on trial." The court then quoted Webster's Dictionary and reviewed Dr. Hodges' testimony and stated: "Although angina may be, as Dr. Hodges testified, a continuing disease, the evidence does not tell us whether during its continuance it has a progressively more serious effect on health or the rapidity of its progression."

Moreover, the Supreme Court said, ". . . death from angina pectoris is not conclusively established."

■ In the case before us the doctor diagnosed the deceased's condition as "myocarditis". Webster's Third New International Dictionary, Unabridged, defines "myocarditis" as an "inflammation of the myocardium". "Myocardium" is defined as "the middle muscular layer of the heart wall".

There is no evidence that such inflammation had a progressively serious effect on the health of Mr. Ives or the rapidity of its

progression. Since no autopsy was performed there was no scientific or exact cause of death established.

It is our opinion and we find that the evidence is not factually insufficient to support the jury's finding to Issue No. 1, and we further find that the finding of the jury on this issue is not so contrary to the great weight and preponderance of the evidence as to be clearly wrong.

These points of error on insufficient evidence and against the great weight and preponderance of the evidence are overruled. We have carefully considered each point of error and each claimed error and overrule each.

Judgment is affirmed.